## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>100 F Street, N.E. Washington, D.C. 20549<br><br>Plaintiff,<br><br>vs.<br><br>DELL INC., MICHAEL S. DELL, KEVIN B.<br>ROLLINS, JAMES M. SCHNEIDER, LESLIE L.<br>JACKSON, NICHOLAS A. R. DUNNING<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT**<br><br>**ECF CASE** |

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC")

alleges as follows:

### SUMMARY

1.    The SEC brings this action for various disclosure and accounting violations

involving Dell Inc. ("Dell") from 2001 to 2006.  Dell's disclosure violations, which relate

primarily to Dell's receipt of large payments from Intel Corporation ("Intel"), fraudulently

misrepresented the basis for Dell's improving profitability.  Dell's separate fraudulent and

improper accounting during this time period wrongfully made it appear that Dell was consistently

meeting Wall Street earnings targets and reducing its operating expenses through the company's

management and  operations.  Dell's Intel-related disclosure violations involved the conduct of

senior executives, including Michael Dell, Chairman and, at various times, Chief Executive

Officer ("CEO"); Dell's former CEO Kevin Rollins ("Rollins"); and Dell's former Chief Financial

Officer ("CFO") James Schneider ("Schneider").  Dell separately committed the accounting

violations through the conduct of defendant Schneider and other senior former accounting

executives.  Defendants Leslie Jackson ("Jackson"), Assistant Corporate Controller, and Nicholas

Dunning ("Dunning"), Finance Director of Dell's Europe, Middle East, and Africa region ("EMEA") aided and abetted Dell's improper accounting.

2.      From 2002 to 2006, Dell failed to disclose the significant benefits it received from large payments from Intel and materially misrepresented the basis for its improving profitability. In Dell's Forms 10-Q and 10-K for this period, and in other public statements, Michael Dell, Rollins, Schneider and others repeatedly cited certain "cost reduction initiatives" and "declining component costs" as the bases for Dell's increasing profit margins. In fact, Dell's increasing profitability was largely attributable to an unusual source of funds: payments from Intel, a microprocessor manufacturer that was one of Dell's largest vendors. During this period, Intel effectively paid Dell not to use processors manufactured by Advanced Micro Devices, Inc. ("AMD"), Intel's arch-rival. Intel's payments to Dell, which were the subject of various antitrust investigations and claims, grew significantly. When measured as a percentage of Dell's operating income, these payments grew from about 10% in fiscal year 2003 ("FY03") to 38% in FY06, peaking at 76% in the first quarter of fiscal 2007 ("Q1FY07"). While almost all of the Intel funds were incorporated into Dell's component costs, Dell did not disclose the existence, much less the magnitude, of the Intel exclusivity payments.

3.      In May 2006 (Q2FY07), Dell announced that it intended to begin using AMD microprocessors in certain of its products later that year. Intel responded by cutting its exclusivity payments. In that same quarter Dell reported a 36% drop in its operating income. In dollar terms, the reduction in Intel exclusivity payments was equivalent to 75% of the decline in Dell's operating income. Michael Dell, Rollins, and Schneider had been warned in the past that Intel would cut its funding if Dell added AMD as a vendor. Nevertheless, in the Q2FY07 earnings call, Dell told investors that the sharp drop in the company's operating results was attributable to Dell

pricing too aggressively in the face of slowing demand and to component costs declining less than expected.

4.      In addition to Dell's disclosure violations, Dell's most senior former accounting personnel engaged in a wide-ranging accounting fraud by maintaining a series of "cookie jar" reserves that it used to cover shortfalls in operating results from FY02 to FY05.

5.      Defendants, by engaging in the conduct alleged as to each below, violated the following:

(i) Dell violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13], promulgated thereunder.  Unless restrained and enjoined, Dell will in the future violate such provisions.

(ii) Michael Dell violated Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and 77q(a)(3)] and Rule 13a-14 of the Securities Exchange Act of 1934 ("Exchange Act") [17 C.F.R. § 240.13a-14] and aided and abetted Dell's violations of Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13], promulgated thereunder, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].  Unless restrained and enjoined, Michael Dell will in the future violate or aid and abet violations of such provisions.

(iii) Rollins violated Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and 77q(a)(3)] and Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14]

and aided and abetted Dell's violations of Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13], promulgated thereunder, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)]. Unless restrained and enjoined, Rollins will in the future violate or aid and abet violations of such provisions.

(iv)  Schneider violated Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and 77q(a)(3)], Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13a-14, 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.13a-14, 240.13b2-1 and 240.13b2-2], promulgated thereunder, and aided and abetted Dell's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13], promulgated thereunder, pursuant to Section 20(e) of the Exchange Act [15 U.S. C. § 78t(e)]. Unless restrained and enjoined, Schneider will in the future violate or aid and abet violations of such provisions.

(v)  Jackson violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2], promulgated thereunder, and aided and abetted Dell's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13], promulgated thereunder, pursuant to Section 20(e) of the Exchange Act [15 U.S. C. § 78t(e)]. Unless restrained and enjoined, Jackson will in the future violate or aid and abet violations of such provisions.

4

(vi)Dunning violated Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)] and Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1], promulgated thereunder, and aided and abetted Dell's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§240.12b-20, 240.13a-1, and 240.13a-13], promulgated thereunder, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)]. Unless restrained and enjoined, Dunning will in the future violate or aid and abet violations of such provisions.

### JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

7.     The Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with acts, practices and courses of business alleged in this Complaint.

8.     Venue is proper in this District pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because, among other reasons, most of the conduct constituting the violations alleged herein occurred within this District.

### DEFENDANTS

9.     **Dell Inc. ("Dell")** is a Fortune 100 company in the business of providing electronic products, including mobility products, desktop PCs, peripherals, servers, networking equipment, and storage. Dell also offers services, including software, infrastructure technology, consulting and applications, and business process services. Dell was incorporated in Delaware in 1984 and is

based in Round Rock, Texas. Since July 2006, Dell's common stock was registered with the

Commission pursuant to Section 12(b) of the Exchange Act and is traded on the NASDAQ Global

Select Market. During the prior relevant period, Dell's common stock was registered with the

Commission under Section 12(g) of the Exchange Act and quoted on the Nasdaq National Market

System. Dell's fiscal year is the 52 or 53 week period ending on the Friday closest to January 31.

Each quarter then runs for either 13 or 14 weeks, also ending on Fridays.

10.     **Michael S. Dell ("Michael Dell")**, 45, resides in Austin, Texas. Michael Dell

founded Dell in 1984 and served as CEO from 1984 until July 2004. In January 2007, he resumed

the role of CEO, a position he holds today. Michael Dell has held the title of Chairman of the

Board and has served as a Director since he founded the company. Michael Dell owns in excess of

five percent of the outstanding common stock of Dell Inc. and has done so since the company went

public in 1988. During the relevant time period, Michael Dell reviewed, approved and signed

Dell's annual reports on Forms 10-K filed with the Commission on April 28, 2003, April 12, 2004,

March 8, 2005 and March 15, 2006. Michael Dell signed the Sarbanes-Oxley certifications for the

April 28, 2003 and April 12, 2004 Forms 10-K. During the relevant time period, while serving as

CEO, Michael Dell also reviewed and approved Dell's quarterly reports on Forms 10-Q filed with

the Commission between September 16, 2002 and June 9, 2004, and signed the Sarbanes-Oxley

certifications for those filings. Michael Dell participated in making public statements concerning

those and other periodic reports. During the period from July 2004 to June 2006 when he was not

CEO, he reviewed at least certain of Dell's Forms 10-Q, but did not sign them.

11.     **Kevin B. Rollins**, 57, resides in Dover, Massachusetts. Rollins joined Dell in April

1996 as Senior Vice President for Corporate Strategy, was named Senior Vice President and

General Manager for the Americas in May 1996, and was named Co-Vice Chairman in 1998. In

2001, Rollins' title was changed from Co-Vice Chairman to Co-President and Co-Chief Operating Officer. He was named CEO of Dell in July 2004. He stepped down as CEO on January 31, 2007 and remained a consultant at Dell until May 4, 2007. During his time as CEO, Rollins reviewed, approved and signed Dell's annual reports on Forms 10-K filed with the Commission on March 8, 2005 and March 15, 2006, and signed the Sarbanes-Oxley certifications for those filings. During his time as CEO, Rollins also reviewed and approved Dell's quarterly reports on Forms 10-Q filed with the Commission between September 7, 2004 and June 7, 2006, and signed the Sarbanes-Oxley certifications for those filings. Rollins participated in making public statements concerning those and other periodic reports. Rollins reviewed at least certain of Dell's Forms 10-Q during FY03, and FY04, but did not sign them.

12.    **James M. Schneider, CPA,** 57, resides in Austin, Texas. Schneider joined Dell in September 1996 as Vice President of Finance and Chief Accounting Officer ("CAO"). While keeping his position as CAO, he was named Senior Vice President in September 1998 and CFO in March 2000. In November 2002, Schneider left the CAO position, but remained CFO, a position he held until January 1, 2007. Schneider left Dell on February 2, 2007. Schneider, a CPA licensed in Wisconsin, also worked as an auditor at what was then Price Waterhouse from 1974 to 1993, rising to the level of partner. Schneider graduated from Carroll University with a bachelor's degree in Accounting. During his time as CAO and CFO, Schneider reviewed, approved and signed Dell's annual reports on Forms 10-K filed with the Commission on May 1, 2002, April 28, 2003, April 12, 2004, March 8, 2005, and March 15, 2006. During his time as CAO, Schneider reviewed, approved and signed Dell's Forms 10-Q filed with the Commission on June 15, 2001, September 17, 2001, December 17, 2001, June 17, 2002 and September 16, 2002. After

November 2002, when he was still CFO, but no longer CAO, Schneider reviewed and approved Dell's Forms 10-Q and signed the Sarbanes-Oxley certifications for those filings.

13.     **Leslie L. Jackson,** 45, resides in Durango, Colorado. Jackson joined Dell in July 1999 as a Finance Senior Manager in Corporate Reporting. In April 2000, while maintaining the same title, she moved to the Treasury Controller. Jackson was named Director of Financial Reporting in October 2001, was named Corporate Assistant Controller in June 2003, and was named Director of Global Finance Systems in January 2005, a position that she retained until she left Dell in 2008. Prior to Dell, Jackson worked as an auditor at Arthur Young from July 1987 to July 1990 and at Ernst & Young from November 1990 to May 1991, rising to the level of senior accountant. Jackson holds a bachelor's degree in Accounting from Texas Tech University and a Master's of Accountancy from the University of Alabama. Jackson was a CPA licensed in Texas, but did not renew her license in December 2008. During her time as Corporate Assistant Controller, Jackson reviewed and approved Dell's annual reports on Forms 10-K and quarterly reports on Forms 10-Q filed with the Commission. From November 2003 to February 2005, Jackson served as a member of Dell's Disclosure Review Committee ("DRC").

14.     **Nicholas A. R. Dunning,** 47, resides in Reading, England. Dunning joined Dell in 1997 as Director of Finance Operations for European Operations, and was named Vice President of Finance for the EMEA Home & Small Business unit ("HSB") in 1998. While in this position, he also became one of two Vice Presidents of Finance for EMEA in 2001, a position he held until early 2004. Dunning then became vice president of Marketing in HSB before being named Vice President and General Manager for the business unit in August 2004. He held this position until he left Dell on February 9, 2007. Dunning was a Chartered Accountant with Arthur Andersen & Co. from 1985 to 1989.

## RELEVANT ENTITIES

15.     **Intel Corporation** is a Delaware corporation, headquartered in Santa Clara, California, which designs, develops, and manufactures semiconductor chips. Intel's common stock is registered with the SEC pursuant to Section 12(b) of the Exchange Act and is traded on the NASDAQ Global Select Market. Intel is current on its SEC filings.

16.     **Advanced Micro Devices, Inc. ("AMD")** is a Delaware corporation, headquartered in Sunnyvale, California, which designs, develops, and manufactures semiconductor chips. AMD's stock is registered with the SEC pursuant to Section 12(b) of the Exchange Act and is traded on the New York Stock Exchange. AMD is current on its SEC filings.

17.     **PricewaterhouseCoopers LLP ("PWC")** is a national public accounting firm with its headquarters in New York, New York. PWC audited Dell's financial statements throughout the relevant period.

## DELL'S FISCAL YEAR

18.     Dell's fiscal year is the 52 or 53 week period ending on the Friday closest to January 31. Each quarter then runs for either 13 or 14 weeks, also ending on Fridays.

## THE DISCLOSURE VIOLATIONS:  INTEL'S PAYMENTS TO DELL

### A.     Background of Intel's Exclusivity Payments to Dell

19.     Dell began its business in 1984 as an assembler of personal computers ("PCs") that were "clones" of the original IBM personal computer. IBM PCs used Intel-designed central processing units ("CPUs") and Microsoft operating systems, so Dell did the same. Early in its corporate history, Dell purchased CPUs from Intel, AMD, and others. Beginning in the 1990s, Dell chose to buy its CPUs exclusively from Intel.

20.     Intel was not always the only choice. AMD produced CPUs for IBM and its clones beginning in 1982 under a license from Intel. In 1986, Intel "canceled" this license, leading to extensive litigation with AMD. In 1994, AMD finally prevailed in its first legal conflict with Intel.

21.     Beginning in 1991, AMD began to make advances in its own CPU design and manufacture, thereby increasing competitive pressure on Intel. In the 1990s, in at least partial response to the rise of AMD, Intel began several programs to promote its CPUs as the industry standard for personal computers. The best known of these programs was the "Intel Inside" marketing campaign. As part of the "Intel Inside" and other joint marketing efforts, Intel paid its vendors, including Dell, certain marketing rebates pursuant to written contracts. (As is the case with all references to Intel payments in this Complaint, Intel did not "pay" Dell; rather, Intel would issue Dell credit memos reducing the overall amount that Dell owed Intel.)

22.     Generally, the moneys associated with these contractual marketing programs were called "market development funds" ("MDF"). As appropriate under the accounting rules, when Dell received MDF payments or credits from Intel, it treated them as reductions in its operating expenses, because the payments offset operating expenses that Dell had incurred in marketing Intel's products.

23.     Beginning at least as early as 2001, Intel began to provide additional "rebates" to Dell and other personal computer makers that were not related to the contractual marketing program and that were different in character from ordinary course price discounts. No one disclosed these payments to the market. In recent years, these payments have been the focus of at least five different government antitrust investigations, as well as a major private antitrust suit launched by AMD. The primary claim in these investigations has been that Intel was paying its

customers to limit their purchases of AMD products.  In Dell's case, the claim was that Intel was paying Dell to boycott AMD entirely.

24.     Intel publicly denied the charges.  Dell said nothing on the subject.  Dell acknowledged in its public filings that Intel was its sole source of CPUs, but it only disclosed information regarding component prices with respect to "vendors" in general.

25.     These disclosures omitted material facts relating to Intel's payments or credits to Dell, which -- separate from the MDF programs -- soared from $61 million in Q1FY03 (10% of operating income) to over $720 million in Q1FY07 (76% of operating income), an increase of about 1000% in four years.  The increase in Intel payments to Dell coincided almost exactly with AMD's introduction of its Opteron CPU that was, in the view of many, technologically superior to Intel's competing CPU.

**B.      The Development of Intel's Exclusivity Payments to Dell**

26.     Up until late 2001, Intel provided Dell rebates -- separate from the MDF programs -- on an undefined *ad hoc* basis.  These rebates reduced Dell's prices below the "Tier 1" price discounts that Intel provided Dell and other large computer assemblers in the ordinary course of business.  At the end of 2001, Intel began a program called "MOAP" (short for "Mother of All Programs"), pursuant to which it agreed to give Dell a 6% rebate going forward on all of Dell's CPU purchases.  The calculation of the percentage rebate evolved over time and was ultimately based on a percentage of Dell's entire net spend with Intel.  This MOAP approach, which Intel could have ceased or amended at any time, relieved Dell of the need to justify each rebate that it sought.

27.     In January 2003, Intel changed the name of the rebate program from MOAP to MCP, which was short for "Meet Competition Program."  "Meeting competition" is a concept under the Robinson-Patman Act of 1936, an antitrust statute that prohibits price discrimination.

The Robinson-Patman Act generally prohibits a vendor from selling the same product at different prices (or on generally different terms) to different customers. The Robinson-Patman Act recognizes a defense to this general prohibition, however, that allows companies to charge different prices to different customers, if one of the customers has a competing vendor offering a better price.

28.    Other than the name of the program, it is not clear how the MCP credits related to the legal parameters of the Robinson-Patman Act. Nevertheless, Intel asked Dell to prepare "Meet Competition Requests" to comply with a framework that Intel provided. As requested, Dell's procurement team regularly produced elaborate schedules that ostensibly allocated the percentage-based rebate it expected to receive from Intel to specific Intel products that Dell purportedly intended to purchase. Intel "replied" to the Dell schedules by indicating how much it was willing to provide in rebates for each specific Intel product. These schedules created the appearance that Intel and Dell were comparing prices for each Intel product that Dell intended to purchase, and that Intel was responding with appropriate rebates to be applied against those products.

29.    In fact, the MCP payments did not relate to any systematic assessment of the pricing of any particular processor; nor did they relate to the specific purchase of any supposedly required processor. The Dell executive overseeing the creation of the "Meet Competition Requests" admitted that these requests were, though required by Intel, a meaningless exercise to Dell: he simply instructed the Dell team preparing the requests to put together enough data to justify a "big[ger] number" than Dell was expecting to negotiate for that quarter's MCP discount.

30.    Rather than matching the particulars of any specific competitive situation, the MCP payments started with a baseline percentage of the aggregate dollar value of Dell's purchases from

Intel. To that baseline, the parties occasionally added large lump-sum amounts based on negotiations between the top management of the two companies that from time-to-time involved Michael Dell and Kevin Rollins.

31.     Although the use of a percentage for the baseline may suggest some sort of contractual commitment, that impression would be incorrect. At any given time, the continuity of MCP payments was at the discretion of Intel, and Intel could cut the payments off at any time without any recourse by Dell.

32.     The baseline percentage changed significantly during the relevant period, largely in response to Dell's assertions that it needed better prices in order to continue offering Intel-based products exclusively. Initially, at the outset of Dell's FY03, the fixed percentage was 6%. But by Dell's FY07, it was over 14%.

33.     The lump-sum amounts did not fit any fixed pattern. Instead, taken together, the overall growth of the MCP payments largely reflected Dell's desire to meet its quarterly forecasts and Intel's desire to keep Dell from buying AMD products.

34.     From Q1FY03 through Q1FY07, Intel's MCP rebates to Dell totaled $4.3 billion ($3.4 billion in percentage-based rebates and $881 million in lump sum payments). The following table breaks these figures down:

## MCP TABLE

| | Percentage Applied for Rebate | Percentage-Based Rebate | Lump Sum Payment | Total MCP | Dell's Reported Operating Income | Increase / (Decrease) in Operating Income | MCP % of Operating Income |
|---|---|---|---|---|---|---|---|
| Q1FY03 | 6% | $61m | - | $61m | $590m | - | 10% |
| Q2FY03 | 6% | $57m | $3m | $60m | $677m | 15% | 9% |
| Q3FY03 | 6% | $59m | $12m | $71m | $758m | 12% | 9% |
| Q4FY03 | 6.3% | $77m | $7m | $84m | $819m | 8% | 10% |
| Q1FY04 | 6.3% | $91m | $8m | $99m | $811m | (1%) | 12% |
| Q2FY04 | 6.3% | $106m | $6m | $112m | $840m | 4% | 13% |
| Q3FY04 | 6.3% | $105m | $40m | $145m | $912m | 9% | 16% |
| Q4FY04 | 7% | $118m | $82m | $200m | $981m | 8% | 20% |
| Q1FY05 | 8.7% | $137m | $70m | $207m | $966m | (2%) | 21% |
| Q2FY05 | 12% + var. | $210m | - | $210m | $1,006m | 4% | 21% |
| Q3FY05 | 12%+ var. | $250m | - | $250m | $1,095m | 9% | 23% |
| Q4FY05 | 12%+ var. | $293m | $75m | $368m | $1,187m | 8% | 31% |
| Q1FY06 | 12%+ var. | $307m | $81m | $388m | $1,174m | (1%) | 33% |
| Q2FY06 | 12%+ var. | $313m | $119m | $432m | $1,173m | - | 37% |
| Q3FY06[1] | 12%+ var. | $339m | - | $339m | $754m | (36%) | 45% |
| Q4FY06 | 14%+ var. | $423m | $60m | $483m | $1,246m | 65% | 39% |
| Q1FY07 | 14%+ var. | $405m | $318m | $723m | $949m | (24%) | 76% |

During this period, Dell's business grew substantially. Dell's total revenue grew from $35 billion to over $57 billion by the end of FY07. Dell's quarterly purchases from Intel rose from $1.4 billion in Q1FY03 (on 6.2 million units) to $2.6 billion in Q1FY07 (on 10.5 million units). As a percentage of Dell's total costs of goods sold, net Intel spend increased from 17% to 22% over the period.

**C.     The Issue of Exclusivity in Dell's Negotiations with Intel**

35.     In 1999, AMD introduced the first version of its Athlon processor for personal computers. This processor was almost universally recognized as being superior to Intel's then

---

[1]     In Q3FY06, Dell recorded a non-recurring, special charge of $442M related warranty costs, workforce realignment, product realizations, excess facilities, and a write-off of goodwill. The Q3FY06 lump sum payments also do not include so-called "Expedites" and other payments that Dell received from Intel.

current top model for PCs, the Pentium III. In 2003, AMD introduced the Opteron 64-bit processor for network servers and workstations. This processor was almost universally recognized as being superior to Intel's then top model for servers, the Xeon.

36.    In 2001, Dell considered using these new AMD CPUs in specific value platforms. During these discussions, in February 2002, one Dell employee reported on a meeting attended by the Dell Senior Vice President responsible for the Intel relationship ("the SVP"), Michael Dell and Rollins: "We also had an interesting exchange on MOAP. Michael/Rollins asked what the impact would be if we did an AMD deal now. [A Dell employee] (predictably) said 'we might see MOAP go down for a couple of quarters, but then Intel would raise it even higher than it is now in order to win the business back.' [the SVP] and I responded by saying we would probably lose 50% of MOAP and 100% of the MDF as long [as] we were selling AMD, and it would probably never come back up, especially in '04+ when the game starts to end . . . ." (ellipses in original). In that quarter, Dell received $61 million in MOAP payments and $72 million in MDF payments from Intel, while its reported operating income was $590 million. Michael Dell identified the SVP as the Dell employee with the most reliable information about Intel's intentions.

37.    Dell subsequently sought higher payments from Intel for not using AMD CPUs. In June 2002, in response to an action item from a meeting with Michael Dell and Rollins, Dell's procurement team developed a "laundry list of things" that the company would require Intel to do for Dell to "remain monogamous." A subsequent version of the list was provided to Michael Dell and Rollins and included an item seeking an increase in MOAP funding. In July 2002, Rollins reported to Michael Dell that Intel "seem[s] to want to do whatever it takes to persuade us to not go with [AMD]."

38.     In Q3FY04 (ended 10/31/03), Dell considered a potential deal involving Microsoft, AMD, and IBM ("MAID"). This deal contemplated that Dell would add Opteron and other AMD CPUs to its product lines and take an ownership interest in AMD. This proposal envisioned Dell shifting 25% of its total CPU purchases to AMD.

39.     As Dell was negotiating the MAID deal, however, Intel's CEO told Michael Dell that Intel was prepared to increase its MCP payments to Dell significantly. The SVP and his Intel counterpart then negotiated a "Tactical and Strategic Fund" through which Intel agreed to pay Dell $258 million over four quarters from Q4FY04 to Q3FY05. On September 30, 2003, Intel's CEO and Michael Dell shook hands on a new MCP deal. Two days later, Michael Dell said to Rollins, Schneider, the SVP, and others: "We need to close down the [MAID] discussions and move on."

40.     In or about 2004, the SVP told Michael Dell and Rollins that if Dell started using AMD CPUs, Intel would likely not only stop or reduce the MOAP and MDF funds it had been paying Dell, but might re-direct those payments to Dell's competitors. Dell decided not to purchase AMD CPUs at that time.

41.     Over the following ten quarters, Intel established five additional MCP programs through which it continued to pay Dell, in the form of higher percentage-based rebates and/or lump sum payments, either not to use AMD CPUs or to delay the announcement of its intention to use AMD CPUs. The MCP payments that Intel provided Dell were the subject of regular negotiations between the companies, with Dell routinely seeking, and Intel commonly agreeing to provide, larger amounts to maintain Dell's exclusive use of Intel CPUs.

**D.      The Importance of Intel's Exclusivity Payments to Dell**

42.     Dell would often seek additional rebates from Intel in order to close a gap between its forecasted results and its earnings targets. Dell was quite open with Intel about the reasons it was requesting additional money.

43.     In Q3FY04, the quarter in which Intel created the "Tactical and Strategic Fund" that was intended to run from Q4FY04 to Q3FY05, Dell asked Intel to advance $40 million from that fund. Contemporaneous Intel notes prepared in September 2003 by Intel's lead negotiator with Dell stated that Dell sought the $40 million lump sum advance to "save their quarter" and referenced Dell's "current Qtr jam." The advance, which comprised 4.4% of Dell's operating income in that period, contributed one penny to Dell's EPS. Dell met analysts' consensus estimate of 26 cents.

44.     Similarly, in Q4FY04, Dell sought a $25 million lump sum payment from the Tactical and Strategic Fund after forecasting that its results would fall short of analysts' consensus. In a January 30, 2004 string of emails to the SVP, Schneider wrote "I think we will barely make the quarter because of the Intel money." Dell would have missed analysts' consensus in this quarter without the additional Intel funds. Rollins however, stated to investors that it was Dell's business model that allowed the company to continue its streak of meeting or exceeding Wall Street earnings targets. Rollins stated during the company's Q4FY04 earnings call that Dell's record of "twelve consecutive quarters of meeting or exceeding guidance to investors, is driven by our tightly controlled supply chain, highly efficient infrastructure and direct relationships with customers." These statements by Rollins were contained in a script that was circulated in advance of the earnings call to Michael Dell, Schneider, and other Dell personnel.

45.     In early March 2004 (Q1FY05), Dell's then-Chief Accounting Officer ("CAO") informed Michael Dell, Rollins, and Schneider that Dell was running behind on its forecasts, but that Dell should be able to meet the consensus EPS number of 28 cents "as long as we get $75 million from Intel." On March 31, 2004, Schneider asked the SVP about the status of his MCP negotiations in an email that refers to the SVP as "Mr. 'the quarter is on your shoulders.'"

46.     Michael Dell and Rollins were involved in the negotiations with Intel to close the gap to consensus EPS. Ultimately, Intel provided Dell a $70 million lump sum payment that quarter (equivalent to approximately 2 cents per share). That quarter, Dell met analysts' EPS consensus of 28 cents. On April 3, 2004, Rollins sent Michael Dell an email arguing that Dell should diversify its business toward higher margin server and other products. He noted that Dell's reliance on Intel payments was a strategic "problem," stating that "for 3 qtrs now, Intel money has made the qtr. A bad way to run the railroad." Rollins subsequently forwarded the email to Schneider.

47.     In December 2004 (Q4FY05), Schneider informed Rollins and the SVP that Dell needed additional money from Intel to meet its targets. The $75 million that Intel agreed to provide that quarter (approximately 2 cents per share) allowed Dell to beat analysts' EPS consensus of 36 cents by 1 cent. In this period as well, Dell would have missed analysts' consensus without the additional Intel funds. Rollins, however, stated to investors that it was Dell's execution that allowed the company to continue its streak of meeting or exceeding Wall Street earnings targets. Rollins stated during the company's Q4FY05 earnings call, "We have now met or beat our guidance to investors for 16 consecutive quarters, demonstrating a consistency of execution that is unmatched in our industry." These statements by Rollins were contained in a script that was circulated in advance of the earnings call to Michael Dell, Schneider, and other Dell personnel.

48.     In June 2005 (Q2FY06), after recognizing that Dell would fall short of its forecasts without additional Intel funds, Rollins wrote to the SVP and another Dell executive, instructing them to seek further MCP payments from Intel. After being told that Dell had already negotiated an additional $30 million MCP from Intel for Q2FY06 and that the prospects for additional MCP

funds were poor, Rollins replied on June 22, 2005, "[t]hen prepare for $25 stock price." The closing price of Dell's stock that day was $40.45.

49.     On June 29, 2005, Rollins e-mailed Schneider and others that he had asked Intel's CEO "for [an additional] $10-20m in July, pull-in, MDF, whatever he wanted to call it, but we needed the favor. His comment in summary was, you don't ask for favors very often, so we will see if we can help. My take away was that he would get us the assistance." Ultimately, Intel provided Dell a $119 million lump sum payment that quarter (equivalent to approximately 4 cents per share), allowing the company to meet analysts' EPS consensus of 38 cents.

50.     In the 20 quarters during this period, from Q1FY02 through Q4FY06, Dell met analysts' EPS consensus in 15 quarters, exceeded consensus by 1 cent in 4 quarters, and exceeded consensus by 2 cents in 1 quarter. Dell would have missed the EPS consensus in every quarter had it not received MCP payments from Intel.

### E.     Dell Knew that Intel Was Paying For Exclusivity

51.     Michael Dell, Rollins, and Schneider had been advised that Intel would likely reduce MOAP/MCP payments by about 50% if Dell began using any AMD CPUs. On numerous occasions during the relevant period, Dell modeled the financial impacts of using AMD CPUs in addition to Intel's. In certain of these models, at least one of which was presented to Michael Dell, Rollins, and Schneider, Dell assumed that it would lose about 50% of the MCP payments if it added any AMD products. This would have matched the amount of MOAP/MCP payments that the SVP then believed Intel to be providing Dell's largest competitor.

52.     Additionally, the SVP advised Schneider in March 2004 that he believed Intel "would move it close to no MCP for the first quarter" after Dell added AMD and would "use some

legal excuse that Intel has to evaluate the whole MCP program based on the Dell decision that eliminates meet comp" because Dell would be using Intel's competition.

53.    Michael Dell admitted to AMD's CEO that, although Dell wanted to use AMD CPUs in its products, it had to terminate negotiations with AMD in the fall of 2003 because Dell feared that it could not bridge the loss of the MCP money if it were to end its exclusive relationship with Intel.

54.    On November 24, 2004 (Q4FY05), Rollins expressed his concern to Schneider that Dell would take "a big hit from Intel pulling our funding" after Dell added AMD. Rollins stated, "The thinking being that at some point we will add AMD and Intel [will] cut back our funding."

55.    During negotiations in Q4FY05 in which Intel initially resisted providing MCP funds to Dell in response to AMD's Opteron CPU, Rollins wrote in an email to Michael Dell, Schneider, and other Dell executives that Intel's "intransigence on MCP is a problem. We are going to have to get off their drug and leave them within 18 months if this is their position on Opteron."

56.    After Intel agreed later in Q4FY05 to create the $275 million Opteron Fund, Rollins wrote in an email to Michael Dell and other Dell executives that "with the deal we just cut with Intel, don't think we can do anything for several qtrs, but assume we will be back at AMD and Intel in about 6-9 months." An internal Intel email, from the Intel employee most responsible for the Dell relationship, described Dell's agreement to continue using Intel CPUs exclusively as the *quid pro quo* for the $275 million fund.

### F.    Dell's Eventual Decision to Use AMD Products

57.    The Opteron Fund payments continued through the end of Dell's Q2FY06. Shortly thereafter, Dell resumed negotiations with AMD about purchasing AMD processors.

58.     On January 31, 2006 (Q4FY06), Rollins sent an email to members of Dell's senior management, including Michael Dell, raising concerns about possible consequences if AMD were to leak the "deal" they were negotiating "before we have products to ship." He observed that, "[i]t will dramatically hurt us with Intel and in the market for our products if they do. . . . We would be forced to deny it."

59.     Upon concluding its negotiations with AMD, Dell planned to announce on May 4, 2006 that it would begin using "a broad range of AMD-based systems." Intel had previously agreed to provide Dell a $198 million lump sum payment in Q1FY07 in addition to the percentage-based payments. To forestall the announcement of Dell's move to AMD, Intel agreed to pay Dell an additional $120 million lump-sum in Q1FY07 (which Intel's CEO believed would be enough to cover Dell's earnings shortfall for the quarter), and an additional $100 million lump-sum each quarter for the following two quarters. Intel's CEO believed that these payments ensured that Dell would continue to use Intel CPUs exclusively until September or October 2006, when Intel hoped to introduce a new server CPU that would alleviate the competitive pressure of AMD's Opteron product, and that Dell would not announce any change to the exclusive relationship before then. Moreover, Intel's CEO believed that any Dell product launch featuring AMD processors later in 2006 would be limited to multiprocessor servers. Dell agreed to cancel its planned May 4, 2006 announcement of AMD-based products.

60.     Even with the $120 million payment that Dell received two days before the end of Q1FY07, Dell's earnings fell short of consensus. This was the first quarter in five years that Dell had missed consensus EPS estimates. In Q1FY07, Dell reported EPS of 33 cents, while consensus was 38 cents. Intel's total MCP payments reduced Dell's cost of goods sold and had the effect of

contributing 24 of Dell's 33 cents per share in this period, with the lump-sum payments alone contributing over 10 cents.

61.     Dell updated its guidance for Q1FY07 after the market closed on May 8, 2006. From May 8, 2006 to May 12, 2006, Dell's stock price fell by over 9%, from $26.43 to $24.02. On May 12, 2006, Schneider wrote to Michael Dell, Rollins, and the SVP that Dell was "getting slammed with missing our numbers and not announcing anything with AMD ... and our current plan of record for Q2 is to beg [Intel] for more money to make our targets." On May 18, 2006, Dell announced that it would add AMD to its product lines by the end of the year. In response, Intel cut its MCP payments to Dell by over a quarter of a billion dollars. This dramatic cut in the MCP payments did not reflect any contemporaneous meaningful purchase of AMD processors or substitution of AMD processors for those of Intel. Rather, Intel's reduction in MCP payments reflected Intel's response to Dell's announcement of an intention to use AMD products in the future.

62.     From Q1FY07 to Q2FY07, Intel's MCP payments fell by $263 million. Prior to this point, there had been only one quarter in the history of the MCP program during which the rebates had not increased -- the quarter after AMD filed its private antitrust lawsuit. In Q1FY07, Dell's reported operating income was $949 million. In Q2FY07, Dell's operating income was $605 million. In dollar terms, the reduction in Intel exclusivity payments was equivalent to 75% of the decline in Dell's operating income.

63.     Dell failed to disclose the impact of the decline in MCP on Dell's operating income. Instead, during the Q2FY07 earnings call about its operating results, Schneider told analysts and investors that the decline in operating income that quarter was attributable to Dell pricing too aggressively in the face of slowing demand and to component costs declining "less than we

anticipated." These statements were contained in a script that was circulated in advance of the earnings call to Michael Dell, Rollins, and other Dell personnel.

64.     The second question asked on the Q2FY07 earnings call was whether "a precipitous or sharp decrease in Intel *co-marketing dollars*" impacted Dell's gross margin that quarter. Rollins replied, "[w]e would probably not communicate anything on that. It is proprietary. We do believe that component prices did not come down as we had anticipated, but we wouldn't comment on any of our agreements with suppliers."

### G.     The Exclusivity Payments Were at Risk and Disguised the True Performance of Dell's Business

65.     The crash in the MCP payments after Dell's announcement of its intent to use AMD processors, and the concurrent contraction in Dell's reported operating income, was testament to the importance of the MCP payments to Dell's operating results. As the MCP Table in paragraph 34 above shows, the MCP payments were initially only 9-10% of Dell's operating income. But by the last quarter before the AMD announcement, these payments constituted 76% of Dell's operating income. Dell's apparent success was hostage to Intel's willingness to continue paying Dell hundreds of millions of dollars.

66.     Moreover, Michael Dell, Rollins, and Schneider also understood that the Intel MCP payments were at risk because of the near continuous scrutiny directed at Intel by various competition authorities around the world and, to the degree that MCP payments were deemed anticompetitive, such payments could abruptly end. By 2003, the U.S. Federal Trade Commission had begun investigating possible antitrust violations by Intel. In April 2004, press reports indicated that the Japan Fair Trade Commission (JFTC) had raided Intel's Japanese office as part of its antitrust investigation. In March 2005, the JFTC announced that it had found that Intel had indeed violated Japan's Antimonopoly Act by paying OEMs "rebates and/or certain funds" on the

condition that the OEMs either not use competitors' CPUs or significantly limit their use. In May 2004, the European Commission's competition authorities sought information from Dell and other OEMs regarding payments they had received from Intel, and then raided Dell's and other OEMs' European offices in June 2005 as part of this investigation. Finally, AMD itself filed a private antitrust lawsuit against Intel in June 2005, alleging that Intel violated the antitrust laws by making payments to Dell and other OEMs contingent on their not using, or limiting their use of, AMD CPUs in their products. Neither Dell nor any other Intel customer was charged with any antitrust violation in any of those proceedings.

67.     Dell understood that Intel's antitrust problems affected Intel's ability to pay Dell increasing amounts of MCP payments. In Q1FY06, Intel told the SVP that it was having difficulties obtaining authorization to increase MCP payments because the European Commission's competition authorities were at Intel's offices at that time. Similarly, after learning of the AMD suit in Q2FY06, the SVP emailed a colleague, "absolute certainty that MCP won't be increased." The following quarter (Q3FY06) was the only period from Q1FY03 through Q1FY07 that Intel's MCP payments to Dell declined. This was also the first quarter since Intel began making MCP payments in 2002 that Dell missed analysts' initial forecast for consensus EPS.

68.     In addition, there was concern at Dell about what further actions Intel might take to punish Dell if Dell began using AMD CPUs. In addition to reducing the MCP payments by 50%, the SVP informed Schneider in 2004 that Intel would likely not make any MCP or MDF payments to Dell in the quarter that Dell announced that it would begin selling AMD CPUs. Also in 2004, the SVP advised Michael Dell and Rollins that Intel might redirect the lost MCP payments to Dell's competitors if Dell added AMD.

**H.** **Dell's Misleading Statements and Omissions in its Forms 10-K and 10-Q**

69. Despite the material impact that the Intel MCP payments had on Dell's operating results, Dell did not disclose any information relating to the payments in any of its annual or quarterly reports filed with the Commission for the periods Q1FY03 through Q1FY07.

70. From FY03 through FY05, investors did not have an actual understanding that Dell received exclusivity payments from Intel. In FY06, certain analysts began speculating that Dell received benefits from Intel for using their CPUs exclusively, though they could not estimate the value of these benefits. In early 2006 (FY07), a widely-followed analyst covering Dell estimated that Intel paid Dell $300 million annually in "marketing" funds in exchange for Dell's exclusive use of its CPUs. This was an accurate estimate of the MDF payments that Intel provided Dell in Dell's prior fiscal year. But this estimate did not come close to reflecting the much larger MCP payments.

71. As shown above in the MCP Table at paragraph 34, Intel's payments constituted large and progressively greater proportions of Dell's earnings. In addition to their effect on Dell's operating income, these payments affected Dell's gross margin percentage, which is more generally known as profit margin. In earnings calls and in its Forms 10-K and 10-Q, Dell regularly attributed ongoing improvements in its gross margin to two factors: "cost reduction initiatives" and "declining component costs." The "cost reduction initiatives" Dell identified involved "manufacturing costs, warranty costs, structural or design costs, and overhead or operating expenses" that were unrelated to the MCP payments. Citing "declining component costs" in its filings and earnings calls was materially misleading. Dell failed to disclose that the gross margin improvements were due to the MCP payments, not ordinary course price reductions that were the consequence of regular decreases in the prices of technology components and/or routine fluctuations in prices based on changes in supply and demand. Dell senior management touted its

ability to leverage declining component costs to a greater degree than its competitors because it maintained little inventory.

72.     In FY06 and Q1FY07, Dell reported decreases in its gross margin percentage:  a 0.5% decrease in FY06 from the prior year (18.3% to 17.8%) and a 1.2% decrease in Q1FY07 from the same period in the prior year (18.6% to 17.4%).  In both periods, Dell's periodic reports refer to component cost reductions as offsetting other events that reduced Dell's margins.  The disclosures during the relevant period were misleading because they masked an important fact: not only was Dell's reported gross margin percentage substantially and increasingly higher than what the company generated without the MCP payments, but Dell was generally becoming less profitable without the MCP payments, not more.

73.     Many of Dell's materially misleading statements and omissions were in the Management Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of Dell's Forms 10-Ks and Forms 10-Qs filed with the Commission during the relevant period.  This is an important section of Dell's financial reports to Dell's investors.  The purpose of the MD&A is to provide investors an opportunity to look at the company through the eyes of management.

74.     Dell's materially misleading MD&A disclosures in its quarterly and annual reports, including the omission of material information concerning the Intel payments, defeated the purpose of the MD&A.  They did not fully disclose Dell's results of operations and the basis for its success.  Dell's quarterly financial reports also failed to disclose information to enable investors to assess material changes in financial condition and results of operations.

75.     As a result, Dell's Forms 10-K and 10-Q and the MD&A sections of those reports, as well as statements made therein, were materially false and misleading during the relevant period.

The MD&A sections of Dell's Forms 10-K and 10-Q for the relevant period did not comply with Item 303 of Regulation S-K [17 C.F.R. § 229.303], including, but not limited to Items 303(a) and 303(b), as required by Section 13(a) of the Exchange Act.

76. For example, because the magnitude of the MCP payments comprised a material proportion of, and were otherwise material to, Dell's annual operating income, gross margin, and other financial metrics that Dell reported in the MD&A of its Forms 10-K, disclosure of their existence and magnitude was necessary to an understanding of Dell's operating results from FY03 through FY06. By failing to disclose the existence and magnitude of these payments, Dell's MD&A failed to comply with Regulation S-K Item 303(a) in each Form 10-K for this period.

77. Because the MCP payments comprised a material proportion of, and were otherwise material to, Dell's quarterly operating income, gross margin and other financial metrics that Dell reported in the MD&A of its Forms 10-Q, disclosure of their existence and magnitude was necessary to an understanding of Dell's quarterly operating results from Q1FY03 through Q1FY07. By failing to make any disclosures relating to these payments, Dell's MD&A failed to comply with Regulation S-K Item 303(b)(2).

78. Dell did not disclose in its annual and quarterly reports and other public statements how the MCP payments affected its annual and quarterly operating results, and thus did not alert investors to its receipt of a material and potentially non-recurring source of funds.

79. A significant reduction in either the MCP or MDF payments would have had a materially unfavorable impact on Dell's operating income. By the time that Dell filed its FY2006 Form 10-K, it intended to end its exclusive relationship with Intel. When Dell filed this Form 10-K, Michael Dell, Rollins, and Schneider knew that Dell would not actually have any AMD products to ship until Q3FY07 at the earliest. As a result, they knew that in Q1FY07 and Q2FY07,

there could not be any positive effects to operating income to offset the loss of MCP payments

prior to actually having AMD products available for sale. They could not have determined that a

material effect on Dell's operating results was not reasonably likely to occur.

80.    Intel's response to Dell's decision to add AMD to its product lines was a known

uncertainty that Dell reasonably expected would have a materially unfavorable impact on its

operating income. By not disclosing such material uncertainty in its Form 10-K for the year ended

February 3, 2006, Dell's MD&A failed to comply with Item 303(a)(3)(ii) in its FY06 Form 10-K

and concealed the material risks from investors.

81.    Michael Dell reviewed, approved, and signed Dell's Forms 10-K for FY03 through

FY06, and reviewed and approved Dell's Forms 10-Q from Q2FY03 through Q1FY05. Michael

Dell also reviewed and approved Dell's Form 10-Q for Q1FY07. Rollins reviewed, approved, and

signed Dell's Forms 10-K for FY05 and FY06, and reviewed and approved Dell's Forms 10-Q for

Q2FY05 through Q1FY07. Schneider reviewed, approved, and signed Dell's Forms 10-K for

FY03 through FY06 and reviewed, approved, and signed Dell's Forms 10-Q from Q1FY03

through Q1FY07.

82.    Pursuant to section 302 of the Sarbanes-Oxley Act, Michael Dell certified that

Dell's Forms 10-K for FY03 and FY04 and Forms 10-Q filed with the Commission between

September 16, 2002 and June 9, 2004 complied with Section 13(a) of the Exchange Act. Pursuant

to Section 302 of the Sarbanes-Oxley Act, Rollins certified that Dell's Forms 10-K for FY05 and

FY06 and Forms 10-Q filed with the Commission between September 7, 2004 and June 7, 2006

complied with Section 13(a) of the Exchange Act. Pursuant to section 302 of the Sarbanes-Oxley

Act, Schneider certified that Dell's Forms 10-K for FY03 through FY06 and Dell's Forms 10-Q

filed with the Commission between September 16, 2002 and June 7, 2006 complied with Section 13(a) of the Exchange Act.

## THE ACCOUNTING VIOLATIONS

83.    From FY02 to FY05, Dell used a variety of "cookie jar" reserves and otherwise manipulated reserve accounts to manage its financial results.  Contrary to GAAP, Dell created and maintained excess accruals in multiple reserve accounts, which Dell used to offset the financial statement impact of future expenses.

84.    As explained more fully below, these manipulations were undertaken to meet consensus earnings targets or to misstate materially important financial metrics.  These manipulations not only materially misstated Dell's financial results, but caused material misstatements in Dell's annual and quarterly reports filed with the Commission during the period. The conduct described in paragraphs 83 through 131 is not part of the basis for the charges against Michael Dell and Rollins.

85.    Dell manipulated reserves including a) the Strat Fund and other "Corporate Contingencies"; b) other cookie jar reserves identified in Risks and Opportunities schedules; c) an improperly-established and used restructuring reserve; d) several reserves in EMEA; e) cookie jar reserves in bonus and profit-sharing accounts; and f) an under-accrued Las Cimas liability reserve.

86.    The Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("FAS 5") and the related interpretations are among the principal GAAP provisions that govern the recognition of loss accruals and reserves.  These accounting principles provide, among other things, that a loss accrual should be recognized with a charge to income when a loss is probable and reasonably estimable. The maintenance of reserves for general or unspecified business risks (sometimes called "general

reserves" or "cookie jar reserves") is not permitted under GAAP. Further, the accounting principles provide, among other things, that any over-accrual of a reserve should be reversed into the income statement as soon as the over-accrual is discovered.

87.     The impacts of Dell's reserve manipulations materially misstated Dell's operating results. In certain quarters, the manipulations enabled Dell to meet analyst consensus EPS estimates. The manipulations also enabled Dell to misstate materially the trend and amount of operating income from Q3FY03 through Q1FY05 of its EMEA segment, an important business unit that Dell highlighted. Instead of increasing every quarter from Q2FY03 through Q1FY05, EMEA's operating income varied substantially.

88.     The reserve manipulations also allowed Dell materially to misstate its operating expenses ("OpEx") as a percentage of revenue ("OpEx percentage" or "OpEx ratio"), and the quarter to quarter trend in this ratio, for over three years, from about Q2FY02 through about Q2FY05. The OpEx ratio was an important financial metric that the Company itself highlighted. As reported, Dell's OpEx ratio during this period was an artificial and fabricated pattern, as shown below:



In the MD&A of every Form 10-Q from Q1FY03 through Q2FY05, and in other public statements,

Dell highlighted each decrease in the ratio as achieving a "record low," and each instance where

the ratio remained flat as maintaining or continuing the "record low."  Dell attributed such

"records" to reported decreases in the ratio of 0.3% in Q1FY03 (from 10.2 % to 9.9%); 0.2% in

Q2FY04 (from 9.8% to 9.6%), and just 0.1% in Q1FY04 from (9.9% to 9.8%).  Dell attributed

achieving or continuing the "record lows" to "cost reduction initiatives" or a "focus on cost

controls."  In fact, Dell's reported OpEx ratio during this period was impacted by accounting

manipulations, and the actual ratio generally varied materially from quarter to quarter during this

period.

A.      **The Strat Fund and Other "Corporate Contingencies"**

89.    From FY02 to FY05, Dell maintained a general reserve called the "Strat Fund"

(short for "Strategic Fund," which is unrelated to the "Tactical and Strategic Fund" discussed

above). This was a cookie jar reserve that Dell maintained primarily to reduce future OpEx.

Dell's corporate finance group referred to the Strat Fund and other improper reserves they

controlled as "contingencies" or "corporate contingencies." These "cookie jar" reserves consisted

of excess, unsupported balances that resided in accounts controlled by the corporate finance group,

including an "other accrued liabilities" account, which Dell executives frequently referred to by its

number, 24990. The Strat Fund was a "sub-account," or subset, of 24990. Dell used the corporate

contingencies primarily to reduce its future OpEx by releasing these excess accruals when

unforecasted expenses arose.

90.    Dell tracked the corporate contingencies in schedules entitled "Estimated

Contingencies in Corporate" (hereinafter "corporate contingency schedules"). Dell's CAO asked

his subordinates to provide him those schedules at least once per quarter. The CAO instructed

subordinates to transfer "excess" accruals – previously-reserved amounts no longer needed for

bona fide liabilities – to the corporate contingencies.

91.    In the 14 quarters from Q1FY02 through Q2FY05, Dell made at least 23 releases

from the Strat Fund and other corporate contingencies, 16 of which were recorded after quarters

ended, while Dell was in the process of closing its books. In a Restatement filed in October 2007,

Dell reversed all Strat Fund activity and all excess balances for the other reserves that appeared on

the corporate contingency schedules.

92.    Schneider knew or was reckless in not knowing that Dell improperly maintained

excess reserves in the corporate contingencies for use in future periods. Schneider received

information about the excess reserves from the corporate finance group. In an email sent to the

CAO just after the FY03 close, a member of the corporate finance group stated, "The one quarter

end thing that I owe Jim is below. He was asking . . . what our contingency is." As a CPA and a

former Audit Partner with Price Waterhouse, Schneider knew, or was reckless in not knowing, that

keeping cookie jar reserves in the corporate contingencies was not in conformance with GAAP.

Nonetheless, Schneider signed one or more management representation letters to PWC in which

he certified that Dell's consolidated financial statements complied with GAAP. Schneider also

reviewed, approved, signed and/or certified the accuracy of Forms 10-K and 10-Q that materially

misstated Dell's financial results because of Dell's improper accounting for the corporate

contingencies. Schneider approved the filings of these periodic reports even though he knew, or

was reckless in not knowing, that Dell's accounting for the corporate contingencies was not in

conformance with GAAP.

93.     Dell received substantial assistance in connection with the corporate contingencies

from Jackson, a Dell Assistant Corporate Controller, and others. Jackson knew or was reckless in

not knowing that Dell improperly maintained excess reserves in the corporate contingencies for

use in future periods. Jackson received several e-mails attaching the corporate contingency

schedules, which tracked such excess reserves, and communicated with others about the corporate

contingencies. Copies of the schedules were kept in a quarterly closing binder that Jackson

maintained and used when briefing top finance executives. As a CPA and former Senior

Accountant at Arthur Young and Ernst & Young, Jackson knew or was reckless in not knowing

that this use of cookie jar reserves was not in conformance with GAAP. Nonetheless, Jackson

signed one or more management representation letters to PWC in which she certified that Dell's

consolidated financial statements complied with GAAP. Jackson also reviewed the Forms 10-K

and 10-Q that materially misstated Dell's financial results because of Dell's improper accounting

for the corporate contingencies. Jackson approved the filings of these periodic reports even though she knew, or was reckless in not knowing, that Dell's accounting for the corporate contingencies was not in conformance with GAAP.

**B.      Other Cookie Jar Reserves Identified in "R&O Schedules"**

94.      Beginning in or about Q1FY01 through about Q2FY04, Dell's Corporate Reporting group prepared, from time to time, a list of items that could help or hinder Dell's efforts to meet its financial targets. Corporate Reporting compiled the items in spreadsheets called "Risks and Opportunities Schedules" ("R&O Schedules"). Schneider and Dell's CAO reviewed or were briefed from the R&O Schedules and used the information to decide whether and to what extent opportunities should be booked. Like the Corporate Contingency Schedules, the R&O Schedules included excess reserves that Dell was carrying from period to period. The R&O Schedules also included non-Corporate accounts, such as reserves maintained in Dell's regional business segments. The R&O Schedules reflect excess accruals carried over from prior periods and improperly released in later periods. Examples include a $6 million release in Q3FY02 and a $5 million release in Q3FY03.

**C.      Dell's Improper Establishment and Use of Restructuring Reserves**

95.      FASB Emerging Issues Task Force Issue No. 94-3, *Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity, (including Certain Costs Incurred in a Restructuring)* ("EITF 94-3"), and the related interpretations are among the principal GAAP provisions that relate to accounting and disclosure of certain costs and liabilities for restructuring activities, which include such things as involuntary employee terminations, contract terminations, and efforts to consolidate or close facilities. These principles allow companies to accrue for restructuring expenses to be incurred in future quarters when certain conditions are met, such as commitment to a formal restructuring plan, notification to affected

employees and establishment of a probable and reasonable estimate of the anticipated

restructuring costs. Further, the principles provide that related restructuring reserves should be

regularly re-evaluated and any amounts no longer needed for the original purpose reversed to

income. Retaining excess reserve amounts or using them for purposes other than that for which

they were originally intended is not permitted under GAAP. Furthermore, costs incurred, but not

specifically contemplated in the original estimate, must be charged to income in the period in

which the expense is incurred.

96.     In Q2FY02 (ended August 3, 2001), Dell recorded a $482 million charge to income

and established related restructuring liabilities in various reserve accounts. In its Form 10-Q for

the quarter ended August 3, 2001, Dell disclosed that it recorded the charge to reduce its workforce

and exit certain activities. GAAP required the amount of the charge to be based on Dell's best

estimates of future qualifying restructuring costs. If Dell subsequently determined that amounts in

the reserves were no longer needed for their originally intended purposes, or exceeded what the

company believed would ultimately be needed, GAAP required Dell to release those excess

amounts to the company's income statement.

97.     Dell improperly built excess accruals into the reserve at its inception, and from

Q3FY02 to Q3FY04, maintained excess amounts from the restructuring reserve rather than

releasing them to income as required by GAAP. Over at least six quarters during this period, Dell

used this excess to offset the impacts of unrelated period costs resulting in a material

misrepresentation of its OpEx.

98.     Dell tracked the excess amounts in the restructuring reserves, and employees of

Dell referred to these amounts internally as "cushions" or "available" balances. From Q4FY02 to

Q2FY04, Dell's CAO received status updates at least once every quarter that tracked these

improper accruals. These documents identified amounts that were "re-designated" to 24990 and other excess amounts still in Dell's restructuring reserves that did not comply with GAAP.

99.    Schneider knew, or was reckless in not knowing, that the restructuring reserve included excess accruals. In November 2001, Dell's Corporate Assistant Controller informed Schneider of excess in the restructuring reserve and Schneider instructed the Corporate Assistant Controller and CAO not to take a negative special charge (i.e. reverse excess amounts back to the income statement as required by GAAP). Schneider received at least one quarterly status update on the restructuring reserve (in Q4FY02) which set forth the amount "available" in the reserve at that point in time.

100.    Schneider also knew, or was reckless in not knowing, that excess from the restructuring reserve was being used to offset unrelated operating expenses. On at least one occasion, Schneider was informed that excess from the restructuring reserve was being utilized to cover an operating expense that was unrelated to the reserve. In May 2003, Dell's Corporate Assistant Controller told Schneider that he and the CAO had "held back $10 million of redesignated special charge reserves" to cover an unrelated to the IRS payment. Schneider knew, or was reckless in not knowing, that that the utilization of excess from the restructuring reserve in this manner was not in conformance with GAAP. Nonetheless, Schneider signed one or more management representation letters to PWC in which he certified that Dell's consolidated financial statements complied with GAAP.

101.    Dell failed to disclose that excess amounts were utilized for non-restructuring related activities. Dell's annual report on Form 10-K filed with the Commission on May 1, 2002 and Dell's quarterly reports on Forms 10-Q filed with the Commission on September 16, 2002 and December 16, 2002 also misrepresented restructuring reserve amounts as "paid," when in fact a

portion of them had been deemed as excess and re-designated to other accounts to be used for unrelated items. In his role as Chief Accounting Officer and CFO, Schneider signed Dell's Form 10-K filed with the Commission on May 1, 2002 and Dell's Form 10-Q filed with the Commission on September 16, 2002. Schneider signed the section 302 Sarbanes-Oxley certification for Dell's Form 10-Q filed with the Commission on December 16, 2002. Schneider approved the filings of these periodic reports even though he knew, or was reckless in not knowing, that Dell's accounting for the Q2FY02 restructuring reserve was not in conformance with GAAP.

### D.   Accounting Manipulations of Reserves at EMEA

102.   In addition to its improper establishment and use of a Corporate restructuring reserve in FY02, Dell improperly created and released a restructuring reserve in its EMEA segment in FY03 and FY04 in contravention of GAAP.

103.   EMEA was an important part of Dell's business and Dell highlighted EMEA as a significant component of its operations. In FY03, EMEA generated 19.5% of Dell's revenues and 13.6% of the company's operating income. In FY04, EMEA grew to 20.5% of Dell's revenues and 18% of the company's operating income.

104.   From Q3FY03 through Q1FY04, EMEA improperly accrued a $26 million reserve to offset the anticipated expenses for a future regional "restructuring." Building the reserve prematurely caused EMEA to understate its operating income from the Q3FY03 through Q1FY04, and enabled the region to overstate its operating income by $23.5 million in Q2FY04, when EMEA released most of the improper reserve.

105.   In furtherance of this scheme, Dunning, one of EMEA's two finance directors reporting to Schneider at the time, and EMEA's accounting team reserved for liabilities in a manner inconsistent with GAAP and misstated EMEA's books and records. After Schneider refused Dunning's request to take a special charge to pay for employee termination and relocation

expenses in EMEA, Dunning participated in the improper creation, maintenance, and release of excess reserves from Q3FY03 to Q3FY04 to offset restructuring expenses. The restructuring reserves, which grew to $26 million, had been created to offset expenses incurred in future periods, even though Dell had not formalized or announced its EMEA restructuring plan in a way that would have been consistent with GAAP. The restructuring reserves were improperly classified in Dell's books as reserves for factory invoices, an expense completely unrelated to restructuring.

106.    In addition to improperly creating a restructuring reserve, EMEA improperly released accruals from bona fide reserves to boost its operating income in Q2FY04. Dunning knew or was reckless in not knowing that EMEA, with no legitimate justification and contrary to GAAP, released $10.8 million from these accounts in large, round-number journal entries on or about August 6, 2003, the day before EMEA's books closed. Twelve days after recording these entries, EMEA reversed them in a $10.8 million entry described only as a "JULY-AC Adjustment." EMEA's release of the $10.8 million boosted the EMEA segment's operating income 8 percent, allowing EMEA to report $138 million in Q2FY04 operating income internally. After a $7 million topside allocation from Corporate, Dell ultimately reported EMEA's operating income as $145 million in its Form 10-Q for the quarter ended August 1, 2003.

107.    Two quarters later, in Q4FY04, EMEA created an improper cookie jar reserve. By the end of Q4FY04, Dunning and the EMEA finance team realized that EMEA would, in the ordinary course of business, significantly exceed its operating income projections for that period. Rather than record all of the excess as income, EMEA's finance team, with Dunning's knowledge, transferred $16 million from EMEA's income statement to various reserve accounts on EMEA's balance sheet. Dunning gave no direction to remove the improper cookie jar reserve and informed Schneider of its existence.

108.    On or about February 4, 2004, the day before EMEA closed its books for the quarter, Schneider asked Dunning about EMEA's reserves, inquiring whether the region had been "able to keep some cushion." Dunning replied that EMEA could have recorded higher operating income and that he "put $16M away." Schneider did not direct that the improper reserves be reversed.

109.    Creating the $16 million cookie jar reserve caused EMEA to understate its operating income in Q4FY04 by 8 percent. In a slide presented in its February 12, 2004 earnings call and subsequently posted on its website, Dell disclosed that the EMEA segment had earned $192 million in operating income in Q4FY04.

110.    In the following quarter, the EMEA Finance Director who had been co-head of Finance with Dunning before assuming sole responsibility for EMEA finance, informed Schneider that EMEA was having difficulty meeting its $159 million operating income target. Schneider questioned the Finance Director's projection, telling him that EMEA's balance sheet was "probably over accrued," and instructed, "[w]e need $175m. You need to tell me how we will get it. I suggest you not be too proud and see what [D]unning has socked away." The Finance Director complied with the request, and released the $16 million that had been put away.

111.    The release of this cookie jar reserve allowed the EMEA segment to report eight consecutive quarters of increasing operating income. In fact, without the cookie jar reserve, EMEA's operating income in Q1FY05 would have declined by about 12.5% from the prior quarter, rather than increased by 3.1%.

112.    Schneider made materially false and misleading representations to PWC about EMEA's interim financial information for Q1FY05 in a management representation letter, which he signed.

E.    **Dell's Cookie Jar Reserves in its Bonus and Profit Sharing Accounts**

113.    In addition to using general reserves to manage its operating results, Dell manipulated its bonus and profit sharing reserve accounts in multiple quarters in FY02 to FY03 to manage its operating results.

114.    In March 2001 (Q1FY02), Dell's Compensation Committee decided on a bonus/profit sharing payout for FY01 that was less than the accrual the company had created to fund the payout. Dell knew that it had over-accrued for the FY01 bonus/profit sharing payout before it filed its FY01 Form 10-K in May 2001. Contrary to GAAP, Dell bled down the excess bonus reserves in later periods, from Q2FY02 through Q1 FY03, to manage Dell's reported OpEx.

115.    In March 2002 (Q1FY03), Dell's Compensation Committee decided on a bonus/profit sharing payout for FY02 that was again less than what the company had accrued. Dell knew that it had over-accrued for the FY02 payout before it filed its FY02 Form 10-K in May 2002. Again, contrary to GAAP, Dell bled down the excess bonus reserves in later periods, from Q2FY03 through Q3FY03, to manage Dell's reported OpEx. As it had done in the prior year, Dell periodically tracked the releases in the bonus and profit sharing reserves.

116.    Schneider knew or was reckless in not knowing that Dell improperly bled down excess bonus reserves. In an email exchange with the Vice President of Corporate Planning and Reporting in Q3FY02 regarding bonus scenarios, Schneider stated that one of the scenarios "still leaves you with an over accrual from last year." The Vice President responded, "I have assumed that the prior year overaccrual will be fully bled out by the end of this year. (As discussed this morning, a lot of these bleeds have been built into the Corp Gen budget for Q2 - Q4.)" As a CPA and a former Audit Partner with Price Waterhouse, Schneider knew, or was reckless in not knowing, that the bleeding down of bonus overaccruals was not in conformance with GAAP. Nonetheless, Schneider signed one or more management representation letters to PWC in which

he certified that Dell's consolidated financial statements complied with GAAP. Schneider also reviewed, approved, signed and/or certified the accuracy of Forms 10-K and 10-Q that materially misstated Dell's financial results because of Dell's improper accounting for the bonus/profit sharing overaccruals. Schneider approved the filings of these periodic reports even though he knew, or was reckless in not knowing, that Dell's accounting for the bonus overaccruals was not in conformance with GAAP.

### F.     Dell's Improper Failure to Increase Reserves for Las Cimas Liabilities

117.     Dell included a provision in the FY02 restructuring reserve to cover the costs of closing its Las Cimas facility in Texas. In May 2002 (Q1FY03), Dell learned that its previously established reserve for exiting its Las Cimas facility was under-accrued. Dell did not at that time quantify the additional reserves needed for Las Cimas and record a corresponding liability, as GAAP required. It was not until October 2005 (Q3FY06) that Dell increased its reserves for closing the Las Cimas facility.

118.     By Q1FY03, Schneider knew, or was reckless in not knowing, that Las Cimas was under-accrued. A March 6, 2002 (Q1FY03) Facilities Steering Committee presentation reflected that the Committee decided to pursue subleases for Las Cimas at low market rates resulting in greater costs than originally reserved. Schneider was the co-chair of Dell's Facilities Steering Committee. Despite this understanding, Schneider did not take steps at that time to quantify the additional reserves needed for Las Cimas, as GAAP required.

119.     By Q1FY04, Schneider had received an analysis from Dell's Facilities Group quantifying the amount by which Las Cimas was under-accrued. In May 2003, Schneider gave a presentation to Dell's Strategy Committee projecting Facilities shortfalls exceeding $60 million from FY2004 to FY2011. Despite this understanding, Schneider did not take steps to record a

liability for the Las Cimas under-accrual required by GAAP. Dell did not reserve for the Las Cimas liability until October 2005.

## DELL'S RESTATEMENT

120.    On or about August 17, 2006, Dell issued a press release, and filed a Form 8-K with the Commission, announcing that its audit committee had begun conducting an independent investigation into certain of Dell's accounting and financial reporting practices.

121.    On or about August 16, 2007, Dell filed with the Commission a Form 8-K announcing that the investigation had been completed, and the results reported to the audit committee. In the August 16 Form 8-K, Dell announced that its audit committee had concluded that Dell's previously issued financial statements for FY03, FY04, FY05, and FY06, including the interim periods within those years, and Q1FY07 ("Restatement Period") "should no longer be relied upon."

122.    In the August 16 Form 8-K, Dell also announced that it would restate the previously issued financial statements for the Restatement Period. Under GAAP, a restatement is required if there is a material error in the financial statements. Dell stated that: "The accounting errors and irregularities that will be corrected are significant because of the combination of the number of issues identified, the qualitative nature of many of the issues, and in some cases, the dollar amounts involved."

123.    On or about October 30, 2007, Dell filed its Form 10-K with the Commission for the fiscal year ended February 2, 2007. The 2007 Form 10-K contained the restated financial statements for the Restatement Period.

124.   The Form 10-K, in both the MD&A and notes to the financial statements, summarized the findings of the audit committee investigation ("Summary of Investigation Findings"). Dell stated in its 2007 Form 10-K:

> The investigation raised questions relating to numerous accounting issues, most of which involved adjustments to various reserve and accrued liability accounts, and identified evidence that certain adjustments appear to have been motivated by the objective of attaining financial targets. According to the investigation, these activities typically occurred in the days immediately following the end of a quarter, when the accounting books were being closed and the results of the quarter were being compiled. The investigation found evidence that, in that timeframe, account balances were reviewed, sometimes at the request or with the knowledge of senior executives, with the goal of seeking adjustments so that quarterly performance objectives could be met. The investigation concluded that a number of these adjustments were improper, including the creation and release of accruals and reserves that appear to have been made for the purpose of enhancing internal performance measures or reported results, as well as the transfer of excess accruals from one liability account to another and the use of the excess balances to offset unrelated expenses in later periods. . . . The investigation identified evidence that accounting adjustments were viewed at times as an acceptable device to compensate for earnings shortfalls that could not be closed through operational means.

125.   Dell's 2007 Form 10-K further stated in the Summary of Investigation Findings: "[I]n a number of instances, purposefully incorrect or incomplete information about these activities was provided to internal or external auditors." Dell also stated in the Summary that: "The errors and irregularities identified in the course of the investigation revealed deficiencies in Dell's accounting and financial control environment, some of which were determined to be material weaknesses, that require corrective and remedial actions."

126.   Dell's Form 10-K described the "Restatement Adjustments" in the MD&A and more fully in the notes to the financial statements, referred to in the MD&A. Dell reiterated that the financial statements for the Restatement Period "should no longer be relied upon." Among the Restatement Adjustments were "Unsubstantiated Accruals and Inadequately Reconciled Accounts." In its 2007 Form 10-K, Dell stated that

In some instances accrual and reserve accounts lacked justification or supporting documentation. In certain cases these accounts were used to accumulate excess amounts from other reserve and accrual accounts. However, these excess reserves were not released to the income statement in the appropriate reporting period or were released for other purposes. . . .

127.    Dell's 2007 Form 10-K, in Item 9A, contained "Management's Report on Internal Control Over Financial Reporting." The Report stated that internal control includes, among other things, those policies and procedures . . . which "provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP." As stated in the report: "A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting that there is more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected."

128.    The Report concluded that there were material weaknesses in Dell's internal control over financial reporting as of February 2, 2007. With respect to the control environment, management concluded:

> We did not maintain a tone and control consciousness that consistently emphasized strict adherence to GAAP. This control deficiency resulted in an environment in which accounting adjustments were viewed at times as an acceptable device to compensate for operational shortfalls, which in certain instances led to inappropriate accounting decisions and entries that appear to have been largely motivated to achieve desired accounting results and, in some instances, involved management override of controls. In a number of instances, information critical to an effective review of transactions and accounting entries was not disclosed to internal and external auditors.

129.    With respect to the period-end financial reporting process, management concluded that there was also a material weakness:

> We did not maintain effective controls over period-end reporting process, including controls with respect to the review, supervision, and monitoring of accounting operations. Specifically: . . .

> We did not design and maintain effective controls to ensure the completeness, accuracy, and timeliness of the recording of accrued liabilities, reserves, and operating expenses . . .

130.   Management concluded that: "These material weaknesses resulted in the restatement of our annual and interim financial statements for Fiscal 2003, 2004, 2005, and 2006 and the first quarter of Fiscal 2007. . . ."

131.   Dell's Form 10-K contained the Report of Independent Registered Pubic Accounting Firm, dated October 29, 2007, by PWC, Dell's independent auditors. PWC audited management's assessment of internal controls, included in Management's Report on Internal Control. PWC rendered its opinion that "management's assessment that the Company did not maintain effective internal control over financial reporting as of February 2, 2007, is fairly stated, in all material respects. . . ." PWC also rendered its opinion that "because of the effects of the material weaknesses . . . on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of February 2, 2007. . . ."

## DELL'S SECURITIES OFFERINGS

132.   Dell filed with the SEC registration statements on Forms S-8 on September 20, 2001, October 4, 2002, and December 16, 2003. The Forms S-8 filed in September 2001 and October 2002 were signed by Michael Dell and Schneider. The two Forms S-8 that Dell filed in December 2003 were signed by Michael Dell, Schneider, and Dell's CAO. The Forms S-8 mentioned above each specifically incorporated by reference the Form 10-K for the fiscal year preceding the Form S-8 and the Forms 10-Q for the fiscal year in which the Form S-8 was filed. For example, the two Forms S-8 filed in December 2003 (Q4FY04) incorporated Dell's FY03 Form 10-K and Dell's Forms 10-Q for Q1FY04, Q2FY04, and Q3FY04. The Forms S-8 also each incorporate all subsequently filed Forms 10-K and Forms 10-Q "prior to the filing of a post-effective amendment." Except for one Form S-8 filed on September 20, 2001, none of the

Forms S-8 mentioned above were subject to the filing of a post-effective amendment during the period relevant to the allegations set forth above.

133.   Dell offered and sold securities continuously from FY2002 through FY2007 through various means. Dell operated an "Employee Stock Ownership Program," pursuant to which it offered and sold common stock to its employees. Dell also offered and sold securities to the public through a "Direct Stock Purchase Program" (DSPP). In addition, Dell granted options and restricted stock to its employees.

## FIRST CLAIM

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. §77q(a)]

### (Against Dell Inc.)

134.   Paragraphs 1, 4-18, and 83-133 are realleged and incorporated by reference as if set forth fully herein.

135.   By reason of the conduct alleged above, Dell, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, employed devices, schemes or artifices to defraud.

136.   By reason of the conduct alleged above, Dell violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## SECOND CLAIM

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5
### Promulgated Thereunder [17 C.F.R. §240.10b-5]

### (Against Dell Inc.)

137.   Paragraphs 1, 4-18, and 83-133 are realleged and incorporated by reference as if set forth fully herein.

138.    By reason of the conduct alleged above, Dell, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, directly or indirectly:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

139.    By reason of the conduct alleged above, Dell violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM

**Violations of Section 17(a)(2) and (3) of the Securities Act**
**[15 U.S.C. §77q(a)(2) and (3)]**

**(Against Dell Inc., Michael Dell, Rollins, and Schneider)**

140.    By reason of the conduct alleged in paragraphs 1-133 above, which are realleged and incorporated by reference as if set forth fully herein, Dell, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, (a) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.  By reason of the conduct alleged above, Dell violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)].

141.    By reason of the conduct alleged in paragraphs 1-3, 5-82, and 132-133 above, which are realleged and incorporated by reference as if set forth fully herein, Michael Dell, in the

offer or sale of securities, by the use of the means or instruments of transportation or

communication in interstate commerce or by use of the mails, directly or indirectly, (a) obtained

money or property by means of untrue statements of material fact or omissions to state material

facts necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading; and (b) engaged in transactions, practices or courses of business

which operated or would operate as a fraud or deceit upon the purchasers of such securities.  By

reason of the conduct alleged above, Michael Dell violated Sections 17(a)(2) and (3) of the

Securities Act [15 U.S.C. § 77q(a)].

142.    By reason of the conduct alleged in paragraphs 1-3, 5-82, and 132-133 above,

which are realleged and incorporated by reference as if set forth fully herein, Rollins, in the offer

or sale of securities, by the use of the means or instruments of transportation or communication in

interstate commerce or by use of the mails, directly or indirectly, (a) obtained money or property

by means of untrue statements of material fact or omissions to state material facts necessary in

order to make the statements made, in the light of the circumstances under which they were made,

not misleading; and (b) engaged in transactions, practices or courses of business which operated or

would operate as a fraud or deceit upon the purchasers of such securities.  By reason of the conduct

alleged above, Rollins violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §

77q(a)].

143.    By reason of the conduct alleged in paragraphs 1-133 above, which are realleged

and incorporated by reference as if set forth fully herein, Schneider, in the offer or sale of securities,

by the use of the means or instruments of transportation or communication in interstate commerce

or by use of the mails, directly or indirectly, (a) obtained money or property by means of untrue

statements of material fact or omissions to state material facts necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities. By reason of the conduct alleged above, Schneider violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)].

### FOURTH CLAIM

**Violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§240.12b-20, 240.13a-1, and 240.13a-13]**

### (Against Dell Inc.)

144. Paragraphs 1-133 above are realleged and incorporated by reference as if fully set forth herein.

145. By reason of the conduct alleged above, Dell filed with the Commission materially false and misleading annual reports on its Forms 10-K, and materially false and misleading quarterly reports on its Forms 10-Q, during its fiscal years ended February 1, 2002, January 31, 2003, January 30, 2004, January 28, 2005 and February 3, 2006, and for the fiscal quarter ended May 5, 2006.

146. By reason of the conduct alleged above, Dell failed to make and keep books, records, and accounts that, in reasonable detail, accurately and fairly reflected the transactions and disposition of its assets.

147. By reason of the conduct alleged above, Dell failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles, or any other applicable criteria and to maintain accountability for assets.

148.   By reason of the conduct alleged above, Dell violated Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

## FIFTH CLAIM

### Aiding and Abetting Violations of Sections 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13]

### (Against Michael Dell, Rollins, Schneider, Jackson, and Dunning)

149.   By reason of the conduct alleged in paragraphs 1-3 and 5-82 above, which are realleged and incorporated by reference as if set forth fully herein, Dell violated Sections 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].   Michael Dell aided and abetted certain of Dell's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a13], promulgated thereunder, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

150.   By reason of the conduct alleged in paragraphs 1-3 and 5-82 above, which are realleged and incorporated by reference as if set forth fully herein, Dell violated Sections 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].   Rollins aided and abetted certain of Dell's violations of Sections 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13], promulgated thereunder, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

151.   By reason of the conduct alleged in paragraphs 1-133 above, which are realleged and incorporated by reference as if set forth fully herein, Dell violated Sections 13(a) of the

Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13]. Schneider aided and abetted certain of Dell's violations of Sections 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13], promulgated thereunder, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

152.    By reason of the conduct alleged in paragraphs 1, 4-18, and 83-133 above, which are realleged and incorporated by reference as if set forth fully herein, Dell violated Sections 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13]. Jackson aided and abetted certain of Dell's violations of Sections 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13], promulgated thereunder, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

153.    By reason of the conduct alleged in paragraphs 1, 4-18, and 83-133 above, which are realleged and incorporated by reference as if set forth fully herein, Dell violated Sections 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13]. Dunning aided and abetted certain of Dell's violations of Sections 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13], promulgated thereunder, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## SIXTH CLAIM

**Aiding and Abetting Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act
[15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]**

**(Against Schneider, Jackson and Dunning)**

154.    By reason of the conduct alleged in paragraphs 1, 4-18, and 83-133 above, which are realleged and incorporated by reference as if set forth fully herein, Dell violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]. Schneider aided and abetted certain of Dell's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)], pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

155.    By reason of the conduct alleged in paragraphs 1, 4-18, and 83-133 above, which are realleged and incorporated by reference as if set forth fully herein, Dell violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]. Jackson aided and abetted certain of Dell's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)], pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

156.    By reason of the conduct alleged in paragraphs 1, 4-18, and 83-133 above, which are realleged and incorporated by reference as if set forth fully herein, Dell violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]. Dunning aided and abetted certain of Dell's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§78m(b)(2)(A) and 78m(b)(2)(B)], pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)].

## SEVENTH CLAIM

### Violations of Section 13(b)(5) of the
### Exchange Act [15 U.S.C. §78m(b)(5)]

### (Against Schneider, Jackson and Dunning)

157.    By reason of the conduct alleged in paragraphs 1, 4-18, and 83-133 above, which are realleged and incorporated by reference as if set forth fully herein, Schneider knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified, directly or indirectly, or caused to be falsified books, records and accounts of Dell that were subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]. By reason of the foregoing, Schneider violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

158.    By reason of the conduct alleged in paragraphs 1, 4-18, 83-93, and 120-133 above, which are realleged and incorporated by reference as if set forth fully herein, Jackson knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified, directly or indirectly, or caused to be falsified books, records and accounts of Dell that were subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]. By reason of the foregoing, Jackson violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

159.    By reason of the conduct alleged in paragraphs 1, 4-18, and 83-133 above, which are realleged and incorporated by reference as if set forth fully herein, Dunning knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified, directly or indirectly, or caused to be falsified books, records and accounts of Dell that were subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]. By

reason of the foregoing, Dunning violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## EIGHTH CLAIM

### Violations of Rule 13a-14 of the Exchange Act [17 C.F.R. §240.13a-14]

### (Against Michael Dell, Rollins, and Schneider)

160.    Michael Dell, as Dell's principal executive officer, certified in Dell's FY03 and FY04 Forms 10-K, filed with the Commission on April 28, 2003, and April 12, 2004, and in Dell's Forms 10-Q for Q2FY03, Q3FY03, Q1FY04, Q2FY04, Q3FY04, and Q1FY05, filed with the Commission between September 16, 2002 and June 9, 2004, that, among other things, he reviewed each of these reports, and based on his knowledge, these reports: (i) did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading and (ii) included financial statements and other information which fairly present, in all material respects, Dell's financial condition, results of operations and cash flows.

161.    By reason of the conduct alleged in paragraphs 1-3 and 5-82 above, which are realleged and reincorporated by reference as if fully set forth herein, Michael Dell violated Exchange Act Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

162.    Rollins, as Dell's principal executive officer, certified in Dell's FY05 and FY06 Forms 10-K, filed with the Commission on March 8, 2005 and March 15, 2006, respectively, and in Dell's Forms 10-Q for Q2FY05, Q3FY05, Q1FY06, Q2FY06, Q3FY06, filed with the Commission between September 7, 2004 and November 28, 2005, and for Q1FY07, filed with the Commission on June 7, 2006, that, among other things, he reviewed each of these reports, and based on his knowledge, these reports: (i) did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances

under which they were made, not misleading and (ii) included financial statements and other

information which fairly present, in all material respects, Dell's financial condition, results of

operations and cash flows.

163.    By reason of the conduct alleged in paragraphs 1-3 and 5-82 above, which are

realleged and reincorporated by reference as if fully set forth herein, Rollins violated Exchange

Act Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

164.    Schneider, as Dell's Chief Financial Officer, certified in Dell's FY03, FY04, FY05

and FY06 Forms 10-K, filed with the Commission on April 28, 2003, April 12, 2004, March 8,

2005 and March 15, 2006, respectively, and in Dell's Forms 10-Q for Q2FY03, Q3FY03, Q1FY04,

Q2FY04, Q3FY04, Q1FY05, Q2FY05, Q3FY05, Q1FY06, Q2FY06, Q3FY06, and Q1FY07 filed

with the Commission between September 16, 2002 and June 7, 2006, that, among other things, he

reviewed each of these reports, and based on his knowledge, these reports:  (i) did not contain any

untrue statement of material fact or omit to state a material fact necessary to make the statements

made, in light of the circumstances under which they were made, not misleading and (ii) included

financial statements and other information which fairly present, in all material respects, Dell's

financial condition, results of operations and cash flows.

165.    By reason of the conduct alleged in paragraphs 1-333 above, which are realleged

and reincorporated by reference as if fully set forth herein, Schneider violated Exchange Act Rule

13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

## NINTH CLAIM

### Violations of Rule 13b2-1 promulgated under the Exchange Act [17 C.F.R. § 240.13b2-1]

### (Against Schneider, Jackson and Dunning)

166.    By reason of the conduct alleged in paragraphs 1, 4-18, and 83-133 above, which

are realleged and incorporated by reference as if set forth fully herein, Schneider, directly or

indirectly, falsified or caused to be falsified, books, records, or accounts described in Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]. By reason of the conduct alleged above, Schneider violated Rule 13b2-1, promulgated under the Exchange Act [17 C.F.R. §240.13b2-1].

167.   By reason of the conduct alleged in paragraphs 1, 4-18, 83-93, and 120-133 above, which are realleged and incorporated by reference as if set forth fully herein, Jackson, directly or indirectly, falsified or caused to be falsified, books, records, or accounts described in Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]. By reason of the conduct alleged above, Jackson violated Rule 13b2-1, promulgated under the Exchange Act [17 C.F.R. §240.13b2-1].

168.   By reason of the conduct alleged in paragraphs 1, 4-18, and 83-133 above, which are realleged and incorporated by reference as if set forth fully herein, Dunning, directly or indirectly, falsified or caused to be falsified, books, records, or accounts described in Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]. By reason of the conduct alleged above, Dunning violated Rule 13b2-1, promulgated under the Exchange Act [17 C.F.R. §240.13b2-1].

## TENTH CLAIM

**Violations of Rule 13b2-2 promulgated under the Exchange Act [17 C.F.R. §240.13b2-2]**

**(Against Schneider and Jackson)**

169.   By reason of the conduct alleged in paragraphs 1, 4-18, and 83-133 above, which are realleged and incorporated by reference as if set forth fully herein, Schneider, directly or indirectly: (a) made or caused to be made a materially false or misleading statement to an accountant in connection with; or (b) omitted to state, or caused another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstance under

which such statements were made, not misleading, to an accountant in connection with: (1) any audit, review or examination of the financial statements of Dell required to be made pursuant to Section 13(b) of the Exchange Act [15 U.S.C. § 78m(b)]; or (2) the preparation or filing of any document or report required to be filed with the Commission pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] or otherwise. By reason of the conduct alleged above, Schneider violated Rule 13b2-2, promulgated under the Exchange Act [17 C.F.R. § 240.13b2-2].

170.    By reason of the conduct alleged in paragraphs 1, 4-18, 83-93, and 120-133 above, which are realleged and incorporated by reference as if set forth fully herein, Jackson, directly or indirectly: (a) made or caused to be made a materially false or misleading statement to an accountant in connection with; or (b) omitted to state, or caused another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstance under which such statements were made, not misleading, to an accountant in connection with: (1) any audit, review or examination of the financial statements of Dell required to be made pursuant to Section 13(b) of the Exchange Act [15 U.S.C. § 78m(b)]; or (2) the preparation or filing of any document or report required to be filed with the Commission pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] or otherwise. By reason of the conduct alleged above, Jackson violated Rule 13b2-2, promulgated under the Exchange Act [17 C.F.R. § 240.13b2-2].

### **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

### **I.**

Permanently restraining and enjoining:

(a)      defendant Dell, its officers, agents, servants, employees, attorneys, assigns

and all those persons in active concert or participation with them who receive actual notice of the

Final Judgment by personal service or otherwise, and each of them from, directly or indirectly,

from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a),

13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and

78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20,

240.13a-1, and 240.13a-13], promulgated thereunder;

(b)      defendant Michael Dell, his agents, servants, employees and attorneys and

all persons in active concert or participation with him who receive actual notice of the Final

Judgment by personal service or otherwise, and each of them from, directly or indirectly, from

violating Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)] and Rule 13a-14 of the

Exchange Act [17 C.F.R. § 240.13a-14], and from aiding and abetting violations of Section 13(a)

of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§

240.12b-20, 240.13a-1, 240.13a-13], promulgated thereunder;

(c)      defendant Rollins, his agents, servants, employees and attorneys and all

persons in active concert or participation with him who receive actual notice of the Final Judgment

by personal service or otherwise, and each of them from, directly or indirectly, from violating

Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)] and Rule 13a-14 of

the Exchange Act [17 C.F.R. § 240.13a-14], and from aiding and abetting violations of Section

13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R.

§§ 240.12b-20, 240.13a-1, 240.13a-13], promulgated thereunder;

(d)      defendant Schneider, his agents, servants, employees and attorneys and all

persons in active concert or participation with him who receive actual notice of the Final Judgment

by personal service or otherwise, and each of them from, directly or indirectly, from violating

Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)],  Rule 13a-14 of the

Exchange Act [17 C.F.R. § 240.13a-14], and Section 13(b)(5) of the Exchange Act [15 U.S.C. §

78m(b)(5)] and Rules 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2], promulgated

thereunder, and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B)

of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20,

13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13], promulgated

thereunder;

(e)     defendant Jackson, her agents, servants, employees and attorneys and all

persons in active concert or participation with her who receive actual notice of the Final Judgment

by personal service or otherwise, and each of them from, directly or indirectly, from violating

Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1 and 13b2-2 [17

C.F.R. §§ 240.13b2-1 and 240.13b2-2], promulgated thereunder, and from aiding and abetting

violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§

78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§

240.12b-20, 240.13a-1, and 240.13a-13], promulgated thereunder;

(f)     defendant Dunning, his agents, servants, employees and attorneys and all

persons in active concert or participation with him who receive actual notice of the Final Judgment

by personal service or otherwise, and each of them from, directly or indirectly, from violating

Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. §

240.13b2-1], promulgated thereunder, and from aiding and abetting violations of Sections 13(a),

13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and

78m(b)(2)(B)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13], promulgated thereunder;

## II.

Ordering defendants Dell, Michael Dell, Rollins, Schneider and Dunning to disgorge ill-gotten gains from the conduct alleged herein and to pay prejudgment interest thereon.

## III.

Ordering defendants Dell, Michael Dell, Rollins, Schneider and Dunning to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## IV.

Retaining jurisdiction of this action to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## V.

Granting such other and further relief as the Court may deem appropriate.

Dated:  July 22, 2010

Respectfully submitted,

John D. Worland, Jr. (Bar #427197)
Richard B. Skaff
Attorney for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Tele:  (202) 551-4438
Fax:   (202) 772-9245
e-mail:  worlandj@sec.gov

Of Counsel:

Christopher Conte
Timothy England
Rami Sibay
James Blenko
Shelby Hunt
Jonathan Jacobs
Ian Rupell